IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MIKE PEAY, COLLEEN PEAY, MATTHEW PEAY, and MEGAN PEAY, Plaintiffs, vs. UTAH COUNTY, JOANN MURPHY, WADE BERRY, ROB RIDING, DAVID SORENSEN, and STEVEN SHAWN CHIPMAN, Defendants. | **MEMORANDUM DECISION AND ORDER** Case No. 2:05-CV-1083 |

Presently before the Court is the defendants' motion for summary judgment. The Court

heard oral argument on the motion on July 31, 2009. Peter Stirba appeared on behalf of the

defendants, and David Brown represented the plaintiffs. At the hearing, the parties agreed that

the excessive force claims alleged by Matthew and Megan Peay have been abandoned, as has the

plaintiffs' claim against Utah County. Utah County is therefore dismissed as a defendant. After

considering the briefs and hearing argument, the Court ruled from the bench as follows: with

regard to plaintiff Colleen Peay's excessive force claim, the Court granted the defendants'

motion for summary judgment; with regard to plaintiff Mike Peay's excessive force claim, the

Court denied the defendants' motion; with regard to the Peays' claim that the defendants are

liable to them for executing a search warrant that was not supported by probable cause, the Court

granted the defendants' motion; concerning the Peays' claim that the search was unreasonable

due to law enforcement's destruction of property, the Court denied the defendants' motion; and

with respect to Mr. and Mrs. Peay's claims for intentional infliction of emotional distress, the

Court denied the defendants' motion.  The Court took the motion under advisement concerning

Matthew and Megan Peay's intentional infliction of emotional distress claims and Matthew

Peay's claim for malicious prosecution.  The Court now issues this Memorandum Decision and

Order addressing those claims and further explaining the Court's reasoning concerning Mr. and

Mrs. Peay's excessive force claims.

### **BACKGROUND**

On January 4, 2004, Wade Berry, a deputy with the Utah County Sheriff's Office,

submitted an affidavit in support of a search warrant to Judge Pullan of Utah's Fourth District

Court.  Deputy Berry's affidavit recited the following:

> 2.     That your affiant on 12-23-03 observed illegal activity at the location of
> 4624 Kestrel Way Eagle Mountain, Utah.  That your affiant while
> speaking to a resident, Matt Peay, regarding a detail concerning
> vandalism.  Your affiant could smell an odor of marijuana.  Matt also
> showed signs of marijuana use, ie. red watery eyes and a slurred speech.
> That your affiant verified that Matt Peay resides at 4624 Kestrel Way
> Eagle Mountain, Utah.  When a young female answered the door your
> affiant asked if Matt Peay was home.  The young female responded "yes,
> I'll get him." Matt appeared at the front door within a minute.

> 3.     That your affiant, a patrol deputy for the City of Eagle Mountain,
> responded to 4624 Kestrel Way for follow-up on a vandalism where Matt
> Peay was a suspect.  The affiant made contact with Matt Peay and spoke
> with him at the door of the residence.  While talking to Matt Peay, your
> affiant could smell the odor of burnt marijuana coming from the residence.
> The affiant also observed Matt Peay and noticed his eyes were red and

watery, and while speaking Matt Peay spoke with a slurred voice.  Your
affiant has been trained and is familiar with the smell of burnt marijuana
as well as signs of impairment from marijuana use.

4.      That Sgt.  Murphy, a Patrol Sgt. assigned to Eagle Mountain, has listed
several citizens complaints of illegal drug and alcohol activity at that
residence located at 4624 Kestrel Way, Eagle Mountain, Utah.  On 3-21-
03 with a complaint of syringes located on the front lawn of 4624 Kestrel
Way (case #430657).  Sgt. Murphy responded to the address and collected
the syringes.  The syringes did not have enough liquid inside to verify the
substance.  Citizens also reported that over the past several months to have
seen parties taking place during early morning hours, with juveniles out in
the front yard openly drinking alcohol and smoking what they believed to
be marijuana by the smell.  Citizens also complained that vehicles would
arrive at all times of the night, stay a short while and leave in the same
vehicle they came in.

5.      Sgt. Murphy reported that within the last two months the citizens of Eagle
Mountain held a Neighborhood Watch meeting to address the issue of
possible illegal drug and alcohol activity at the residence of 4624 Kestrel
Way in Eagle Mountain.  Citizens reported that activity during all hours of
the night at the residence ceased after the Neighborhood Watch meeting
convened one house North of 4624 Kestrel Way.  The activity ceased for
over a month and a half but the activity started up again including late
night parties involving occupied vehicles activity in and out of the
property.  Sgt. Murphy has received a complaint within the last seven days
that citizens are observing juveniles drinking alcohol and smoking what
they believed to be marijuana by the smell, at the residence of 4624
Kestrel Way again.

6.      That approximately two months ago Coleen Peay, who resides at 4624
Kestrel way, was stopped by Sgt. Murphy for a traffic violation.  Coleen
Peay showed a concealed firearms permit and reported she had a handgun
in the vehicle at the time.  Coleen Peay's driver license returns to the
address of 4624 Kestrel Way Eagle Mountain.

7.      That Deputy Knapp, a patrol deputy assigned to Eagle Mountain, received
information within the last year of illegal drug activity located at the
residence of 4624 Kestrel Way Eagle Mountain, Utah.  A citizen reported
to Deputy Knapp that the citizen overheard a conversation between Matt
Peay and another juvenile.  Matt was bragging that his parents did not

have a problem with him smoking marijuana and that they would join him in the activity on the couch of their living room.

8.  That within the last four months Deputy Knapp stopped a vehicle for a traffic violation. The driver, Mike Peay was driving on suspension at the time. At the time of the traffic stop Mike Peay was carrying a canceled handgun with a canceled firearms permit. That in October of 2003 Deputy Knapp responded to the residence for a vandalism complaint on the residence located at 4624 Kestrel Way Eagle Mountain, Utah. While looking at the residence he noticed surveillance camera's on 3 sides of the residence.

9.  That your affiant conducted an independent investigation of the residence located at 4624 Kestrel Way Eagle Mountain, Utah. Your affiant contacted Eagle Mountain City Offices utilities and has confirmed that a Michael Peay has resided at this location since August 2000.

10. That your affiant believes that executing this warrant with notice of intent or authority will be a higher risk to officers due to the fact that 2 occupants including been confirmed with concealed guns and that there is surveillance cameras located on the residence.

Pls.' Mem. in Opp. Ex. 4 (numbering and grammatical errors in original).

Based on this information, Judge Pullan found probable cause for the search and authorized a no-knock warrant on December 26, 2003.

The search warrant was executed on January 4, 2004, at approximately 11:00 p.m. Because of the Peays' firearm possession and surveillance system, a S.W.A.T. team was involved.  Deputy Sorenson used a ram to break down a door and the team filed into the home. Officers immediately found Mr. and Mrs. Peay in the front room area of the home.  According to Deputy Sorenson, Mr. and Mrs. Peay were aggressively yelling as S.W.A.T. entered.

Mr. and Mrs. Peay claim the officers immediately became physical with them without justification.  Mrs. Peay's account of her encounter with officers appears undisputed.  She states

that she was forcibly removed from the couch and placed roughly on the floor.  She alleges that
her head and knees hit the floor.  She was then handcuffed and placed back on a chair.

Mr. Peay's encounter with law enforcement was somewhat different.  According to Mr.
Peay, after officers burst into his home he was tackled from behind by about four or five officers.
He claims he was punched in the left eye and kicked a couple of times, and then about four
officers placed their bodies on his head, both shoulders, and both legs.  After being handcuffed,
he claims an officer kicked him in his right side.  He also claims that after being placed in
handcuffs and leg restraints, he was tased simultaneously on the right side of his back and the
back of his legs repeatedly.  Officers then allegedly rolled Mr. Peay over onto his back and
someone in a sheriff's uniform punched him in his other eye.  Eventually, after 15 to 20 minutes,
officers raised Mr. Peay and sat him on the couch.  Mr. Peay claims that as a result of the
officers' violence, he required two right shoulder surgeries and suffered injuries to his ribs and
arms.  Mrs. Peay's description of Mr. Peay's encounter, although similar to Mr. Peay's in many
ways, states that Mr. Peay's only resistence to the officers was a result of small movements
required to reposition himself due to a diabetic needle in his stomach and an insulin pump
system that was attached to his body.  Her deposition testimony was unclear whether she
perceived Mr. Peay as handcuffed at the time Deputy Sorenson deployed the taser.

Officer Sorenson's description of Mr. Peay's encounter differs drastically from that of the
Peays.  Deputy Sorenson describes the event as follows: At the time Mr. Peay was on the
ground, "he was pushing himself up, trying to push up off the ground with his hand.  And it
seems like he was trying to push forward or do something with his feet."  Defs.' Mem. in Supp.

Ex. F at 23:6-9.  Mr. Peay had his arms underneath his body and officers had to pull his arms out

from underneath him.  Deputy Sorenson could see Mr. Peay's body and the officers "lurching up

and down." *Id.* at 24:21.  During the struggle, Deputy Sorenson realized that officers' attempts to

get Mr. Peay's hands from underneath his body were futile.  As a result, Deputy Sorenson

determined that for the safety of everyone involved he needed to deploy his taser to secure Mr.

Peay.  He pressed the contact points of the taser against Mr. Peay's right thigh/buttocks area and

pulled the trigger.  This was ineffective.  Deputy Sorenson moved the taser slightly, to the inside

of Mr. Peay's left thigh, and activated the taser again.  Again, this was ineffective.  Finally,

Deputy Sorenson pressed the taser to Mr. Peay's lower back and triggered a third cycle.  Mr.

Peay attempted to swat the taser away, and at this point officers were able to get Mr. Peay's

hands behind his back.  Deputy Sorenson states that at the time of the tasing, Mr. Peay "was not

restrained in any way.  When [he] administered the driver stuns, [Mr. Peay] was still struggling

and still had his hands locked underneath his body." *Id.* at 59:13-15.

After officers detained the Peays, they searched the residence.  Officers did not locate

any evidence of a marijuana grow operation as they had expected.  They did find drug

paraphernalia.

Megan Peay, Matthew Peay, and Juan Ramirez were not at home when the officers

entered the residence.  Sometime after S.W.A.T.'s arrival, Megan and Matthew Peay arrived in a

friend's car.  When they pulled onto their street, Megan and Matthew noticed several law

enforcement vehicles, an ambulance, and an EMT at their home.  Law enforcement officers then

questioned Megan and Matthew Peay and Juan Ramirez.

Deputy Berry interviewed Mr. Ramirez.  Mr. Ramirez admitted to using marijuana on a regular basis.  Deputy Berry states that he searched Mr. Ramirez and found a codeine pill in his pocket.  According to Deputy Berry, Mr. Ramirez admitted that Matthew Peay had given him the pill.  Deputy Berry then questioned Matthew Peay concerning the pill.

Under Deputy Berry's version of the events, Matthew Peay admitted giving Mr. Ramirez the codeine pill.  He said that he had been prescribed the pills for a broken finger and that he had given Mr. Ramirez the pill just a week prior.  Additionally, Deputy Berry testified in his deposition that during the search, a bottle of pills prescribed to Mr. Peay had been located and the codeine pill from Mr. Ramirez's pocket matched the pills in the bottle.

Matthew Peay's version of the events is somewhat different than Deputy Berry's.  According to Matthew, Deputy Berry questioned Mr. Ramirez in his presence and Mr. Ramirez stated that someone by the name of Matt had given him the pill, but not Matthew Peay.  Matthew also claimed that he had never been given a prescription for codeine.

Some time after the search, Matthew Peay and Juan Ramirez were charged with narcotics violations based on the alleged distribution of the codeine pill to Juan Ramirez.

The Peay family claims that the search caused them unnecessary physical pain, emotional suffering, and a home left in shambles.  Ultimately, the Peays argue that Mr. Peay's recent death can be attributed to the excessive force used against him.  Additionally, the Peays claim that the officers ransacked their home for no apparent reason.  Mrs. Peay says that a law enforcement officer broke a window to their trailer despite having keys to the door.  The Peays claim that officers smashed holes in walls for no reason, broke windows, and smashed at least two doors.

They state that one of these doors was not even closed.  Megan Peay states that her room was ransacked and officers broke glass dolls and a bracelet.  She says that officers ate some of her candy and drank a bottle of her soda.  The Peays say they lost several pets as a direct result of the officers' actions, and that the officers damaged a dresser, the backyard fence, a water bed, and a rocker/recliner.

On July 22, 2004, the Honorable Claudia Laycock of the Utah Fourth District Court heard argument on a motion to suppress the evidence obtained as a result of the search.  At that hearing, Judge Laycock granted the motion.  According to Judge Laycock, the affidavit submitted by Deputy Berry did not provide probable cause for the search.  As a result, the State moved the court to dismiss the only charges that arose from the search–the charges against Mr. Ramirez and Matthew Peay.

In the instant case, the Peay family claims that the search of their home was unreasonable under the Fourth Amendment.  Mr. and Mrs. Peay claim that law enforcement officers used excessive force against them and unreasonably damaged their home.  The family argues that it was unreasonable for law enforcement to cause damage to their personal and physical property.  They also claim that law enforcement's actions in this case amount to intentional infliction of emotional distress.  Matthew Peay claims that the criminal prosecution brought against him was without probable cause and based on malice.  The defendants have moved for summary judgment on all of these claims.  As announced at the close of oral argument on July 31, 2009, and as discussed more fully below, the Court grants the defendants' motion in part and denies the motion in part.

## DISCUSSION

### I.       Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure states that summary judgment is appropriate where the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c). When applying this standard, the court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

### II.      Excessive Force Claims

Claims that arresting, or investigating, officers used excessive force against a person during a search or seizure must be analyzed under the reasonableness standard of the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  In the Tenth Circuit, this inquiry requires a Court to determine whether officer actions were objectively reasonable given the particular facts and circumstances of the situation.  *Thompson v. City of Lawrence, Kansas*, 58 F.3d 1511, 1516 (10th Cir. 1995).  Actions are to be "assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions."  *Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001) (quoting *Graham*, 490 U.S. at 1865).

In this case, the officers' actions against Mrs. Peay were objectively reasonable as a matter of law.  Concerning Mr. Peay, however, genuine issues of material fact preclude summary judgment.

A.      **Colleen Peay**

The Court grants the defendants' motion for summary judgment with respect to Colleen Peay's excessive force claim.  Mrs. Peay complains that officers used excessive force against her when they "forcibly picked [her] up from the couch and placed [her] on the floor roughly."  Pls.' Mem. in Opp. Ex. 1 at 11:3-4.  She claims that as a result of the officers' actions, her head hit the floor, her knees hit the floor, and her back was sore.  Even viewing these facts in the light most favorable to Mrs. Peay, however, the defendants actions did not rise to a level that violated the Fourth Amendment.

At the time officers executed the search warrant, they were apprised of several important facts that justified their use of some force.  First, Officers knew that both Mike and Colleen Peay possessed concealed weapons permits and carried firearms pursuant to those permits.  Second, Officers knew that the Peay residence was equipped with surveillance equipment that could alert the Peays to the officers' presence prior to their entering the home.  Taken together, these circumstances created the potential for a dangerous situation.  Under such circumstances, it was not unreasonable for officers to enter the residence quickly and to physically place Mrs. Peay on the floor.

The Tenth Circuit Court of Appeals ruled in *Thompson* that facts such as those present in this case will not support a claim for excessive force.  In that case, armed law enforcement officers entered a business establishment in order to effectuate a search of the premises and the seizure of a man inside.  *Thompson,* 58 F.3d at 1514.  Upon their entry, officers seized an individual that they did not expect to be present in the establishment.  *Id.* at 1517.  They shoved

this individual to the ground, drew a weapon, and temporarily detained her.  *Id.*  That individual

sued arguing that the force used against her was excessive under the circumstances.  *Id.*  The

court disagreed.  *Id.*  According to the court, the volatility of the situation justified the officers'

actions, especially considering that the relationship between the individual and the suspect were

unknown and officers did not know how the individual would react to the situation.  *Id.*

 If anything, the facts in this case support officers use of force more than the facts in

*Thompson*.  In *Thompson*, there were no allegations that the occupants of the business

establishment would either be aware of officers as they approached or that they would be armed

or dangerous.  *See id.* at 1514-16.  In this case, however, officers knew that Mr. and Mrs. Peay

carried firearms and had surveillance equipment installed on the residence.  This created a

volatile situation that justified law enforcement to use an appropriate amount of force to control

the situation.  Officers were justified in physically lifting Mrs. Peay off of the couch and placing

her on the floor.  And even if the stress of the situation resulted in Mrs. Peay being placed

roughly on the ground, no reasonable jury could find that the officers' conduct was

unreasonable.

 **B.** **Mike Peay**

 Viewing the facts of this case in the light most favorable to Mr. Peay, the Court denies

the defendants' motion for summary judgment.  Mr. Peay claims the law enforcement officers

used excessive force against him by hitting him, kicking him, and tasing him while he was in

handcuffs and lying peacefully on the floor.  Mr. Peay alleges that as a result, he suffered

physical injury.

The defendants' argument is two-fold.  The defendants argue that the circumstances surrounding the raid justified them in using force and deploying a taser to detain Mr. Peay.  Additionally, the defendants argue that the action against them is barred by qualified immunity.  They argue that in order to defeat qualified immunity, Mr. Peay must demonstrate that at the time of the officers' conduct, the law clearly established that their conduct violated a constitutional right.  As of January 2004, the defendants claim that the relevant law did not clearly establish such a violation.  The defendants' arguments are not compelling.

First, the excessive force allegations by Mr. Peay involve more than just being tased multiple times by officers.  Mr. Peay's argument is that not only was tased repeatedly when it was not warranted, but also that he was hit, kicked, and otherwise treated violently while already in handcuffs.  Second, the Court cannot say that the law regarding taser use, or abuse, as it relates to excessive force claims, was absolutely unclear as of January 2004.  The pertinent question the Court must ask in this excessive force case is whether the facts, as stated by Mr. Peay, reveal that the force used by officers was unreasonable under the circumstances.  The Tenth Circuit recognized as early as 1991 that the objective reasonableness standard in excessive force claims is clearly established.  *Dixon v. Richer*, 922 F.2d 1456, 1462 (10th Cir. 1991).  The allegation in this case is that the force used by officers was unreasonable because Mr. Peay was not resisting arrest, yet officers chose to hit him, kick him, and deploy a taser multiple times, at least partially while Mr. Peay was handcuffed.  Although the law regarding taser use was surely less developed in January 2004 than it is now, all taser use prior to that time cannot be immediately deemed as constitutional.  Just as if an officer punched a helpless, calm, and

handcuffed individual in order to inflict pain, a claim for excessive force would be permissible if an officer tased a handcuffed, compliant, and calm individual.  The pertinent question in this case is whether officers engaged in unreasonable conduct.  A fact-finder is required to answer this classic question of fact:  Was the force used by the officers reasonable under the circumstances?

Additionally, qualified immunity is not appropriate at this stage in the litigation because this case involves allegations of excessive force.  When applying the qualified immunity doctrine in excessive force cases, "the qualified immunity question is usually answered in the Fourth Amendment inquiry.  This is because, in the excessive force context, the Fourth Amendment inquiry asks directly whether the police officer reasonably could have believed that the force was necessary under the circumstances."  *Dixon*, 922 F.2d at 1463.  Here, factual questions exist concerning whether the officers' conduct was reasonable.  There is no question that there is a dispute over whether Mr. Peay was already in handcuffs when he was tased.  Therefore, on the limited state of the record before the Court, a finding of qualified immunity is not appropriate.  The defendants' motion for summary judgment in this regard is denied.

## III.    Malicious Prosecution of Matthew Peay

The defendants seek summary judgment on Matthew Peay's claim for malicious prosecution.  According to Matthew Peay, the "[d]efendants filed false charges against [him]" which were subsequently dismissed, "[t]he three-count criminal indictment was initiated without probable cause," and "[t]he defendants acted maliciously or for a purpose other than bringing [him] to justice."  Compl. 10.

A successful claim for malicious prosecution in Utah requires

(1) [a] criminal proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the accused; (3) absence of probable cause for the proceeding; and (4) malice, or a primary purpose other than that of bringing an offender to justice.

*Amica Mut. Ins. Co. v. Schettler*, 768 P.2d 950, 959 (Utah Ct. App. 1989) (quoting *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 843 (Utah Ct. App. 1987) (internal quotations omitted)).  In this case, even viewing the facts in the light most favorable to Matthew Peay, no reasonable jury could find that all of these elements are met.

First, Matthew Peay has not pointed to any facts in the record that demonstrate that State officials prosecuted him out of malice or for a purpose other than bringing him to justice.  He argues that because the evidence against him was suppressed by the Utah district court based on an invalid search warrant, malice can be inferred.  But this alone is insufficient.  The malice element required for a malicious prosecution claim requires that criminal proceedings are initiated primarily for a "purpose other than that of bringing an offender to justice," *Amica Mut. Ins. Co.*, 768 P.2d at 959, or at a minimum, some "wrongful or improper motive." *Johnson v. Mount Ogden Enters.*, 460 P.2d 333, 335 (Utah 1969).  The fact that one judge determined the search warrant lacked probable cause does not mean that law enforcement officers and the prosecuting authority had an inappropriate purpose for their actions.  Even though the Peays argue that officers knew the search warrant was unsupported by probable cause, they present no evidence in support of their claim.  Nor do they provide anything beyond conjecture that law enforcement's purpose in searching the Peay residence was for any purpose other than attempting to bring offenders to justice.

-14-

Second, based on the undisputed facts, it appears the prosecuting authority had probable cause to initiate criminal proceedings against Matthew Peay.  In the context of a malicious prosecution claim, probable cause to initiate criminal proceedings is found where "a reasonable man in [the defendants] position would believe, and . . . does in fact believe, that he has sufficient information as to both the facts and the applicable law to justify him in initiating the criminal proceedings without further investigation or verification."  *Id.* (quoting *Hodges v. Gibson Products Co.*, 811 P.2d 151, 158 (Utah 1991)).  Here, while some facts about the situation are disputed, it is undisputed that law enforcement officers discovered a codeine pill in Juan Ramirez's pocket.  It is also undisputed that when asked where he obtained the pill, Mr. Ramirez stated that he obtained the pill from "Matt."  It is further undisputed that Deputy Berry testified in his deposition that Matthew Peay stated he had been given a prescription for codeine. Finally, there is no dispute that officers found a bottle of codeine pills within the Peay residence that contained pills matching the pill found on Mr. Ramirez.  These facts are sufficient to provide probable cause for a charge against Matthew Peay for distribution of narcotics.  Whether the prescribed codeine pills were for Mr. Peay rather than Matthew Peay, and whether Mr. Ramirez's claimed reference to "Matt" was to someone other than Matthew Peay, probable cause nevertheless remains.  These additional facts merely create a triable issue of fact concerning whether Matthew Peay had given Mr. Ramirez the pill as Matthew Peay allegedly admitted.  The Court grants the defendants' motion for summary judgment on this claim.

**IV.    Intentional Infliction of Emotional Distress**

The defendants also seek summary judgment on the Peays' intentional infliction of emotional distress claims.  At the hearing, the Court denied the defendants' motion with respect to Mr. and Mrs. Peay.  With respect to Matthew and Megan Peay, the Court denies the defendants' motion as well.

According to the complaint, the defendants engaged in unnecessary destruction of property and physical abuse with either the intent of inflicting emotional distress upon all of the defendants or under circumstances where any reasonable person would realize that emotional distress would result.  Mrs. Peay stated in her deposition that in addition to physical abuse, the defendants put holes in the walls, broke a camper window despite having keys to its door, kicked in a bedroom door that was not even shut, and ransacked Megan Peay's bedroom and bathroom. Megan Peay also stated in her deposition that officers "destroyed" her room.  Pls.' Mem. in Opp. Ex. 11 at 21:11.  She said that her bed was turned over, her closet had been emptied, and valuables such as dolls and bracelets had been broken.  The Peays also claim that they lost three pets during the search.

Under Utah law, a claim for intentional infliction of emotional distress lies where there is "(1) outrageous conduct by the defendant; (2) the defendant's intent to cause, or reckless disregard of the probability of causing, emotional distress; (3) severe emotional distress; and (4) an actual and proximate causal link between the tortious conduct and the emotional distress." *White v. Blackburn*, 787 P.2d 1315, 1317 (Utah Ct. App. 1990).  Viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could find that these elements have been met.

-16-

If officers engaged in unnecessary physical abuse and random acts of destruction to the Peays' property, a jury could find that conduct outrageous and intolerable.  As the alleged conduct occurred during a police search, a jury could determine a reasonable officer should have realized that engaging in outrageous conduct such as the alleged acts would be likely to cause emotional distress.  And although the Peays did not plead severe emotional distress, the Court is willing to indulge the plaintiffs' now apparent argument that severe distress resulted from the defendants alleged conduct.  These alleged facts are sufficient to survive summary judgment.

Rather than attack the factual basis of the Peays' claim, the defendants argue that the Utah Governmental Immunity Act ("UGIA") precludes liability.  Typically, state employees cannot be held liable under the UGIA.  *See* Utah Code Ann. § 63G-7-202 (2008).  An exception to this rule is found where an employee has engaged in willful misconduct.  *Id.* § 202(3)(c)(i).

Here, the alleged facts are sufficient to avoid application of the UGIA at this time.  The Peays have alleged that the defendants physically abused Mr. Peay and willfully destroyed their property without any valid reason.  If a jury finds these allegations to be true, a reasonable jury could find that the willful misconduct exception to the UGIA applies and that the defendants' conduct inflicted severe emotional distress upon all of the plaintiffs.  This is a genuine issue of material fact that precludes summary judgment.  The defendants' motion is denied in this regard.

## **CONCLUSION**

The law is settled that officers executing a search warrant are entitled to use some force against occupants of property in order to control the situation and to protect lives.  The degree of

force used, however, must be reasonable.  In this case, even viewing the facts in the light most favorable to Mrs. Peay, no reasonable jury could determine that officers used an unreasonable amount of force on her.  Her claim is dismissed with prejudice.  On the other hand, viewing the facts in the light most favorable to Mr. Peay, a reasonable jury could find that officers used excessive force.  He claims he was hit, kicked, and tased, while handcuffed, at a time that such force was unnecessary and unwarranted.  These allegations are sufficient to allow his claims to be presented to a jury.

Megan and Matthew Peay's claims for intentional infliction of emotional distress are also sufficient to be presented to a jury.  Megan and Matthew have alleged the defendants engaged in outrageous conduct which they knew or should have known would cause emotional distress. Viewing the facts presented in the light most favorable to the plaintiffs, a reasonable jury could return a verdict in their favor.  Viewing the facts in the light most favorable to Matthew Peay on his malicious prosecution claim, however, no reasonable jury could find in his favor. Accordingly, that claim is dismissed with prejudice.

Dated this 23rd day of September, 2009.

_Dee Benson_
Dee Benson
United States District Judge